**RITE—RESEARCH IMPROVES the ENVIRONMENT, INC.,
Plaintiff-Appellant,**

v.

**Douglas M. COSTLE, Administrator of the Environmental Protection Agency, Etc. et al., Defendants-Appellees.**

**No. 78–2278.**

United States Court of Appeals, Fifth Circuit.

May 26, 1981.

---

Fleming & Neuman, Joseph Z. Fleming, Miami, Fla., for plaintiff-appellant.

Michael McCord, James W. Moorman, Edward J. Shawaker, Maria A. Iizuka, Dept. of Justice, Land and Natural Resources Div., Lisa Friedman, Atty., U. S. Environmental Protection Agency, Washington, D. C., Mary Ella Johnson, Asst. U. S. Atty., Miami, Fla., for Douglas M. Costle and the Environmental Protection Agency.

Terry Cole, Deputy Counsel, Dept. of Environmental Regulation, Tallahassee, Fla., for Dept. of Environmental Regulation.

Peter S. Tell, Asst. County Atty., Miami, Fla., for Metropolitan Dade County.

William P. Burns, Asst. Gen. Counsel, Miami, Fla., for Miami-Dade Water and Sewer Authority.

Andrew H. Moriber, Asst. City Atty., Joseph A. Wanick and John A. Ritter, City Attys., Miami Beach, Fla., for City of Miami Beach.

Before GOLDBERG, CHARLES CLARK and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

RITE—Research Improves the Environment, Incorporated, plaintiff-appellant in this action, appeals the award of summary judgment in favor of defendants. The federal defendants in this action are Douglas M. Costle, Administrator of the Environmental Protection Agency, and the Environmental Protection Agency ("EPA"); the state defendants are the State of Florida and the Department of Environmental Regulation ("DER"); the metropolitan defendants are the Miami-Dade Water and Sewer Authority and Metropolitan Dade County. The City of Miami Beach was joined as a necessary party defendant. In October, 1976, RITE sued the defendants under tne Federal Water Pollution Control Act Amendment of 1972, Pub.L. 92–500, 86 Stat. 816 ("FWPCA"), and in January, 1978, RITE amended its pleadings to include suit under the Clean Water Act of 1977, Pub.L. 95–217, 91 Stat. 1566 ("CWA"). The trial court granted the defendants' motions for summary judgment on the ground · that RITE had no standing to maintain the action. 78 F.R.D. 321 (S.D.Fla.1978). We reverse.

I. *Phase I: The Initial Application*

Plaintiff RITE is a nonprofit corporation whose members are committed to the installation of a research pilot project to demonstrate a method of sewage disposal in Southeast Florida termed "deep current assimilation." RITE contends that this method of sewage disposal is uniquely suited to the geography of Southeast Florida because of the unusual proximity of the Gulf Stream which would alleviate the necessity of secondary treatment of raw sewage through chemical processing.

On November 2, 1971, the City of Miami Beach approved a $10,500,000 bond issue for the purpose of building a sewage transmission line from Miami Beach to a secondary sewage treatment plant located on Virginia Key. Shortly after validation of the bond issue,[1] however, the City of Miami Beach requested information on deep water assimilation of sewage effluent as an alternative to the Virginia Key sewage treatment plan. Although the City had already entered into contracts with the Miami-Dade Sewer and Water Authority, the City had recently received information regarding new research by the Sea Grant program at the Rosenstiel School of Marine and Atmospheric Sciences, at the University of Miami. This research suggested that deep current sewage assimilation would be safer for effluence from residential communities than the secondary treatment with its near shore chemical discharge.[2]

As a result of this scientific data, on November 11, 1974, the City Commission voted to submit an application to the EPA for approval of a deep current assimilation project. The application was filed pursuant to Section 105 of the FWPCA, 33 U.S.C. § 1255, which provided for funding with special federal grants for research and development.[3] Included with the City's appli-

---

1. The bond issue was validated in 1972, and the validation was upheld on appeal in *State v. City of Miami Beach*, 272 So.2d 151 (Fla.1973).

2. R., Vol. I 35. The City of Miami Beach requested Dr. James C. Carpenter of the Sea Grant Program to summarize research on deep current assimilation. Carpenter concluded that:

 Miami Beach is located in an extremely advantageous environment with respect to the design of ocean outfall. Water depths of 400 feet are present only 3 miles offshore and the Florida Current is present at that distance to provide a continuous supply of water suitable for dilution; . . . . In addition, there is a temperature decrease with depth that is present throughout the year, so that a diffus-

er system could be used to avoid having the discharge appear in the surface waters.

3. 33 U.S.C. § 1255 provided in relevant part:

 (a) The Administrator is authorized to conduct in the Environmental Protection Agency, and to make grants to any State, municipality, or intermunicipal or interstate agency for the purpose of assisting in the development of—

 (1) any project which will demonstrate a new or improved method of preventing, reducing, and eliminating the discharge into any waters of pollutants . . .; or

 (2) any project which will demonstrate advanced waste treatment and water purification methods.

cation were a description of the proposed project by the Director of Public Works for the City of Miami Beach, the Carpenter report, *supra*, "Deep Water Assimilation of Miami Beach Waste Waters: Evaluation of Compliance with Federal Regulations and Criteria, Ocean Dumping," and a legal opinion letter by special counsel for the city concluding that the deep current assimilation project was "supported by substantial competent evidence and in accordance with the essential requirements of law—including Public Law 92–500 (FWPCA)." Furthermore, the application expressed the City's belief that "[b]oth the capital investment and the operating cost of the deep current assimilation method of disposal would be approximately ⅛th that of secondary treatment." The application concluded that the "City Council and the City Administration of Miami Beach consider the project to be sound and meritorious and to offer a means of demonstrating how at least a half a billion dollars can be saved in waste water treatment in Southeast Florida."

The EPA took the position that the proposed project was not permissible under the FWPCA, and on January 23, 1975, formally denied the application. The EPA contended that Section 301(b)(1)(B) of the FWPCA, 33 U.S.C. § 1311(b)(1)(B), required that all sewage effluents undergo secondary treatment, and informed the City by letter that:

> P.L. 92–500 requires secondary treatment for all discharges from publicly owned treatment works by 1977/1978. We have concluded that legally there can be no waiver of the secondary treatment requirement even for a research project. Therefore, we could not participate in the project . . . unless existing Federal laws were amended.

## II. *Political and Economic Pressure*

On appeal we must focus upon the facts following the EPA's denial of the city's application because of appellant's contention that the federal government engaged in a pattern of conduct amounting to "bureaucratic blackmail" in order to illegally coerce the city into complying with the EPA's position requiring secondary treatment. On February 19, 1975, the Miami Beach City Council reapplied for approval of the research project because of its continued belief that the project was lawful under the FWPCA, and because of "the magnitude of the savings in public funds involved." R., Vol. I, 9. On May 14, 1975, the City called a meeting during which special legal counsel for the City reasserted that the demonstration project was lawful. The Council then voted to authorize the filing of suit in federal district court against the EPA, seeking a declaratory decree "that the City's proposal for a demonstration project is consistent with federal, state and local pollution control laws." *Id.*

Following the City's authorization of suit, RITE contends that the Environmental Protection Agency and Administrator Train indicated to City Council representatives and to the Florida Department of Environmental Regulation (DER) that federal funding for sewage treatment would be withdrawn unless the City agreed before May 30, 1975, to proceed without modification according to the Environmental Protection Agency original proposal. R., Vol. I, 10. RITE further contends that the EPA made statements that, in addition to the loss of $13,000,000 in sewage project funds, the City of Miami Beach could expect "to have difficulty in the future in connection with any federal funding of 'HUD grants' in connection with public housing." *Id.*

In its complaint, plaintiff alleges sufficient facts to establish a prima facie case that coercive political and economic pressures were brought to bear upon the City of Miami Beach, with the result that the City withdrew its opposition to the Administrator's interpretation of the FWPCA. Significantly, only one week after the City voted to authorize suit, the City voted to rescind its previous authorization. The Councilmen at that May 21, 1975, meeting furthermore

confirmed that the reason they were changing their vote, and were not allowing the special counsel to proceed with a declaratory judgment suit, was because they did not want to risk retaliatory action by the federal government. At the May 21 City Council meeting one City Councilman stated that:

> [T]he proponents of entering into the suit speculated that we would not be attacked or punished [on May 14, 1975] .... However, I would like to point out that as of this morning, a telegram, forwarded to us by E.P.A. ... takes part of this discussion out of the arena of speculation and puts us into the arena of fact .... Now we can, of course, speculate further as to what a Federal Judge or some other benefactor might or might not do, but we know what we're up against. We're up against the immediate loss of $700,000 and possibly more, we're up against a *written threat to remove the $13,000,000* Federal funding for a transmission line, we are up against a written threat that we may well be forced to comply ....

R., Vol. IV, 743–44 (emphasis supplied).

Similarly, RITE's contention that the City felt intimidated by the capacity for "built-in retribution" inherent in the EPA's processing of federal H.U.D. grants is supported by the statements of City Councilman Redford:

> I will say this, there is one built-in retribution and it is not done from any rancor whatsoever and it is public housing. Public housing has to check through

E.P.A. before it is granted. It is a normal course of events, the public housing has to go through E.P.A. to see if there's a proper sewage disposal system. This was jangled before us for many years, saying, "you're not going to get any HUD grants because HUD has to check through the E.P.A., and if you don't have the system, you don't get it," and we have had problems in the southern part of Dade County on housing because of not having an accepted system ....

R., Vol. IV, 755.[4]

When the City of Miami Beach withdrew its authorization to sue, plaintiff RITE filed suit alleging that its members, which included Miami Beach taxpayers, residents, and homeowners, had been effectively denied the right to obtain the best practical technology at the most reasonable cost, in contravention to the FWPCA. Additionally, RITE sought to protect for itself and its members the estuarine areas of Biscayne Bay for fishing, swimming, and recreational activity, which areas allegedly would be harmed by failure to comply with the provisions of the FWPCA.

## III. *Phase II: The 1977 Clean Water Act*

While this litigation was pending, Congress amended the FWPCA by passing the Clean Water Act of 1977, *supra*. The CWA was signed into law on December 27, 1977, and contained several sections clarifying the precise issues over which the parties had been litigating.[5]

---

4. For further evidence which substantiates appellant's "bureaucratic blackmail" contentions *see* R., Vol. V, 1050–51, including statements by City Councilman Spaet and Mayor Rosen.

5. The relevant section of the CWA, § 44, 33 U.S.C. § 1311(h), amended former Section 301(b)(1)(B) and provided:

 (h) The Administrator, with the concurrence of the State, *may issue a permit under section 1342 of this title [33 U.S.C.] which modifies the requirements of subsection (b)(1)(B)* of this section with respect to the discharge of any pollutant in an existing discharge from a publicly owned treatment works into marine waters, if the applicant demonstrates to the satisfaction of the Administrator that—

(1) there is an applicable water quality standard specific to the pollutant for which the modification is requested, which has been identified under section 1314(a)(b) of this title;

(2) such modified requirements will not interfere with the attainment or maintenance of that water quality which assures protection of public water supplies and the protection and propagation of a balanced, indigenous population of shellfish, fish and wildlife, and allows recreational activities, in and on the water;

(3) the applicant has established a system for monitoring the impact of such discharge on a representative sample of aquatic biota, to the extent practicable;

Based upon these amendments, RITE filed supplemental pleadings in support of its motion for a declaratory judgment, contending that "House Conferees have basically agreed that the RITE position was correct and that [the] FWPCA did not require the single science of waste water treatment as the EPA had incorrectly contended." R., Vol. VI, 1248.

Despite the fact that the CWA amendments authorized the Administrator to modify the secondary treatment requirements of Section 301(b)(1)(B), during Senate hearings the EPA Assistant Administrator Thomas C. Jorling expressed misgivings regarding the ocean outfall alternative. When pressed by Senator Anderson to explain the EPA position on the ocean outfall alternative, the following dialogue occurred:

> SENATOR ANDERSON: In testimony that we took in Washington, and I think it is the same in many of our coastal communities, they seem to take the position that if you dump the effluent into saltwater, that all your problems are solved, you don't have to worry about spending money setting up a secondary treatment facility. Are you as confident as those municipal people are that that is a wise way to set up a water treatment plant?
>
> MR. JORLING: No, Senator, I am not as confident.[6]

(4) such modified requirements will not result in any additional requirements on any other point or nonpoint source;
(5) all applicable pretreatment requirements for sources introducing waste into such treatment works will be enforced;
(6) to the extent practicable, the applicant has established a schedule of activities designed to eliminate the entrance of toxic pollutants from nonindustrial sources into such treatment works;
(7) there will be no new or substantially increased discharges from the point source of the pollutant to which the modification applies above that volume of discharge specified in the permit;
(8) any funds available to the owner of such treatment works under subchapter II of this chapter will be used to achieve the degree of effluent reduction required by section 1281(b) and (g)(2)(A) of this title or

Six months later, on December 7, 1977, Administrator Jorling announced in a letter addressed to Senator Muskie, Chairman of the subcommittee on Environmental Pollution of the Committee on Environment and Public Works, that the EPA intended to impose a geographical limitation upon Section 301(h). In that letter Administrator Jorling stated that the CWA provision relating to municipal deep ocean outfalls would only be applied in:

> a limited number of areas; California ..., San Juan, American Samoa, the Virgin Islands, Honolulu, Seattle and Anchorage. I would note that this listing does not in any way prejudge the question of whether outfalls in those areas would, in fact, qualify under this section."[7]

In response to Administrator Jorling's letter, Senator Gravel, who had originally drafted § 301(h), stated that the EPA was improperly attempting to limit the ocean outfall alternatives to specific geographical locations. Senator Gravel stated:

> Finally, a word about the municipal modification procedure. The conference report accurately reflects my concerns about the requirement that certain coastal communities should provide secondary treatment of conventional pollutants when natural action of the receiving body eliminates the need to do so. The conference report mentions several communities

to carry out the requirements of this subsection.
For the purposes of this subsection the *phrase "the discharge of any pollutant into marine waters" refers to a discharge into deep waters of the territorial sea or the waters of the contiguous zone,* or into saline estuarine waters where there is strong tidal movement and other hydrological and geological characteristics which the Administrator determines necessary to allow compliance with paragraph (2) of this subsection, and section 1251(a)(2) of this title. [Emphasis supplied.]

6. *Reprinted* in 95th Cong., 2d Sess., Legislative History of the Clean Water Act of 1977, Vol. 4, at 1113 (1977).

7. *Reprinted in* 95 Cong.Rec. S 19,645–46 (1977) (daily ed. Dec. 7, 1977) (letter to Sen. Muskie).

that might be likely to qualify for the modification provision. When I introduced the measure I did not intend to limit the application of the provision to Anchorage, Seward, and a few other cities. I intended to allow any city that can meet the geographical requirements to come forward and attempt to prove their case. (That might even include communities currently under schedule to provide secondary treatment.) This is my understanding of the conference's intention as well. I can understand the EPA's concerns about the administrative burden this provision might place on the agency, but I might remind my friends at the agency that we should not legislate unreasonably so as to accommodate an agency. There are a number of communities that have been and will be subjected to administrative burdens way beyond their financial and administrative capacity because of the need to comply with the secondary treatment requirement. With this modification procedure for coastal communities that qualify, and the other provisions in the bill for alternative and innovative technologies, as well as recycle capabilities, the Congress has announced its intention to put some sense into the treatment of municipal wastes.

. . . .

The modification procedure, then, . . . denies no coastal community with the qualifying geographical characteristics the right to show its ability to meet the other conditions of the provision."[8]

As a result of the passage of the CWA amendments, the City of Miami Beach remained hopeful that the demonstration project could still be utilized in order to save the municipality considerable funds. On January 4, 1978, the City Commission (formerly the City Council) met and adopted a resolution which "respectfully requested the Federal Court for its earliest possible ruling" on the pending litigation. The City Attorney attached a copy of the resolution to a motion for expediting cause in which the City informed the court that it had delayed the final award of secondary sewage construction contracts pending a decision on the merits. R., Vol. VI, 1287.

## IV. Renewed Pressure

The EPA responded to this information by threatening "enforcement action" against the City if it were to delay further construction of the secondary treatment facilities. On January 27, 1978, E. Stallings Howell, Florida Project Manager for EPA Regional Office IV, wrote to the City Manager of Miami Beach that "[a]ny delay in initiation of construction will place the City of Miami Beach in violation of the Enforcement Compliance Schedule Letter (ESCL) which is a part of the discharge permit, and would therefore, require the appropriate enforcement action." R., Vol. VI, 1302.

Two weeks after receipt of the EPA's letter the City Commission called an emergency meeting over the weekend which only four of the seven City Commissioners were able to attend. Fearful of the most recently threatened federal action, the Mayor attempted to pressure the Commission into awarding the contracts. Despite the absence of three Commissioners, the contracts were awarded.[9] Ten days later, the

---

8. 95 Cong.Rec. S 19,679 (1977) (daily ed. Dec. 7, 1977).

9. R., Vol. VI, 1328 (minutes of the City Commission meeting):

Mayor Haber: This is one of the most important decisions that will be made by this Commission. I do not know what the time element is. I've read the memos. They indicate that there is some very serious time consideration, that the Federal and State agencies are watching us with a view toward trying to determine whether or not we are being timely in the execution of our contracts and obligations. I would say that this is a decision to be made, of course, and to be guided by the City Attorney and the City Manager. I will have to excuse myself momentarily, but I do want to say on the record, having followed this matter, having listened to all the arguments pro and con, having read all of the documents in this text today and the ones that preceded it, although there are issues and obviously they're going to be presented today as they have before, I want to say clearly and I'm volunteering it, that if I were here to vote on this matter, and I hope that if there are only four members of the Commission remaining at this table, those four mem-

federal district court refused to consider RITE's suit on the merits, holding that RITE had no standing to assert its claim. From this order, RITE appeals.

## V. *Standing*

The district court dismissed plaintiff's suit on the ground that RITE had no standing to maintain the action. Because appellant has successfully asserted standing on two grounds, we reverse.

■ We turn first to the district court's conclusion that RITE seeks to vindicate only "a generalized grievance" and has alleged an injury which is "simply too abstract to constitute 'injury in fact'." There is absolutely no question that, under *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), a not-for-profit organization satisfies the injury in fact requirement of Article III of the Constitution when it "allege[s] that it or its members w[ill] be affected in any of their activities or pastimes" by the allegedly illegal actions of which it complains. 405 U.S. at 735, 92 S.Ct. at 1366. The Supreme Court in *Sierra Club* premised its standing analysis upon the principle that "[w]here the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged a 'personal stake in the outcome of the controversy.'" 405 U.S. at 732, 92 S.Ct. at 1364. The Court thus concluded that the Sierra Club had failed to establish a personal stake in the outcome because that organization's pleadings contained no allegations that its members would be directly affected by the proposed Mineral King development.

■ In the instant case, RITE has alleged precisely what Sierra Club did not. Appellant has virtually tracked the Supreme Court's language by specifically alleging in its verified complaint that RITE members will be adversely affected by the pollution of the water and the contamination of the marine life. RITE members have therefore alleged a concrete "injury in fact"—the injury which flows from the fact that RITE members will no longer be able to swim or fish in the waters surrounding Miami Beach because of the chemical contamination caused by secondary treatment.[10] Comparing the Court's language in *Sierra Club* and the allegations in RITE's complaint, we must conclude that appellant has alleged an "injury in fact" within the meaning of Article III of the Constitution, and therefore RITE has standing to obtain judicial review on the merits.

But the appellant here asserts an even stronger claim for standing than that alleged by the *Sierra Club* litigants. As mentioned above, the Court's reasoning was premised upon the fact that Sierra Club could point to no specific statutory provision authorizing federal suit. In the instant case appellant brings suit pursuant to Section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365, a provision which specifically authorizes lawsuits such as this one in the federal courts. Section 505 states:

Citizen Suits

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agen-

---

bers will act if action is needed on this or any other matter.

Mr. Sahl: Mr. Mayor, you're asking four Commissioners to act on a contract . . . .

Mayor Haber: No, no. I am not asking four Commissioners to act. I am saying that you will be guided as I would be guided by the City Manager and the City Attorney.

Mr. Sahl: Fine and dandy, yes; but this is a $7 million dollar contract.

Mayor Haber: That is correct.

Mr. Sahl: And I doubt it very, very much if any four out of seven in their right mind in

any Commission will go ahead and take a vote where a $7 million contract is staring them in the face. This isn't buying a couple of frankfurts.

10. *See* R., Vol. I, at 2, where the complaint states: "RITE seeks to protect for itself and its members the estuarine areas of Biscayne Bay for fishing, swimming, and recreational activity and the ocean waters adjacent to and off the coast of the City of Miami Beach."

cy to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator.

The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

The trial court failed to mention Section 505 in its memorandum opinion apparently concluding, in reliance upon *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), that Congress could grant an express right of standing only to persons who would otherwise be barred by prudential, and not constitutional rules of standing. Apparently, because the trial court concluded that RITE members were not "injured in fact," the court also concluded that Section 505 would be inapplicable.

We are not persuaded that this ends the matter. First, RITE has met the constitutional standing requirement by properly pleading an "injury" within the meaning of *Sierra Club*. Second, it is well settled that "Congress may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." *Linda R. S. v. Richard D.*, 410 U.S. 614, 617 n. 3, 93 S.Ct. 1146, 1148 n.3, 35 L.Ed.2d 536 (1973).[11]

■ The district court's reliance upon the axiom that prudential, but not constitutional, standing requirements may be waived by legislative enactment does not therefore fully comprehend the issue. While every lawsuit which receives judicial review on the merits must fall within the scope of Article III of the Constitution, it is a matter of black letter law that Article III does not limit congressional power to define categories of individuals as parties sufficiently aggrieved by a particular governmental action to warrant a statutory right to sue. As Professor Laurence Tribe noted in *American Constitutional Law*, page 80, (Foundation Press, 1978):

At all events, it seems clear that any article III-based requirement of factual or concrete injury serves only to limit the ability of federal courts to confer standing in the absence of statute; article III has not been treated as limiting congressional power to define categories of individuals or groups as parties sufficiently aggrieved by particular governmental actions to warrant federal judicial intervention at their behest. In effect, someone is "injured in fact" by an action for purposes of article III if the person has a statutory right to complain of the action in a federal court, a conclusion that should not seem surprising once one recalls the separation-of-powers roots of justiciability doctrine. [Footnotes omitted.][12]

11. In *Linda R. S. v. Richard D.*, 410 U.S. 614, 93 S.Ct. 1146, 35 L.Ed.2d 536 (1973), the mother of an illegitimate child brought a class action seeking federal injunctive relief against state officials who, while prosecuting fathers of legitimate children for non-support, refused to prosecute the fathers of illegitimate children. Mr. Justice Marshall, for the Court, denied standing stating that:

Although the law of standing has been greatly changed in the last 10 years, we have steadfastly adhered to the requirement that, *at least in the absence of a statute expressly conferring standing*, federal plaintiffs must allege some threatened or actual injury resulting from the putatively illegal action before a federal court may assume jurisdiction. *Id.* at 617, 93 S.Ct. at 1148 (emphasis supplied; footnotes omitted).

12. Similarly, we are not persuaded by the district court's reliance upon *Schlesinger v. Reservists Committee to Stop the War*, 418 U.S. 208, 94 S.Ct. 2925, 41 L.Ed.2d 706 (1974), that prudential rules of standing should be invoked because RITE's claim involves a generalized grievance "shared in substantially equal meas-

Appellant thus asserts two grounds for standing—one pursuant to *Sierra Club*, the other pursuant to Section 505, and appellant's reliance upon their combination is well placed. Those courts which have considered citizens' suits under the FWPCA have suggested that the two are interwoven, with the effect that proof of "injury" under *Sierra Club* greatly strengthens a citizen's right to sue under Section 505. For example, in *National Sea Clammers Association v. New York*, 616 F.2d 1222 (3d Cir.), *cert. granted,* —— U.S. ——, 101 S.Ct. 314, 66 L.Ed.2d 145 (1980),[13] an association of fishermen sued federal, state, and local officials and the EPA to enjoin the discharge of toxic sewage which contaminated the shellfish and marinelife in the waters where plaintiffs fished. The association alleged a violation of the FWPCA, including the 1977 Clean Water Act Amendment. The district court granted summary judgment for the defendants, holding that the notice provision of Section 505(b) was a jurisdictional prerequisite to suit and that the association's failure to give notice barred suit under Section 505(a).

The court of appeals reversed. In so doing the court emphasized that Congress had intended to authorize standing for the broadest possible scope of litigants in order to foster enforcement by "private attorneys general":

> The Senate version of the bill would have permitted any person to enforce the terms of the Act. The House bill would have limited citizens' suit narrowly to suits brought by two types of plaintiffs, citizens of the geographic area who were directly affected by the alleged violation, or groups of persons who ... had shown an interest in the area or the controversy. The Conference Committee chose a middle path, limiting the section 505(a) remedy to citizens, but defining citizen broadly in section 505(g). [Section 505(g) states: For purposes of this section the term "citizen" means a person or persons having an interest which is or may be adversely affected.] The intent of Congress was thus to provide generally for citizens' suits which would not be subject to the jurisdictional amount requirement and yet would provide for private attorney general enforcement to the maximum degree permitted by the Court's *Sierra Club* decision.

*Id.* at 1226–27 (footnotes omitted).

*National Sea* went on to hold that the plaintiffs were not barred by the notice provision of Section 505(b) because that provision only applied when "a non-injured member of the public sues to enforce the Act." *Id.* at 1227. The court's holding is significant in that it implies its inverse with equal force, namely that a non-injured member of the public has standing to sue under Section 505 provided he complies with the notice requirements. As the court put it, not only did the statute grant a cause of action for "the protection of individuals from injury caused by the polluting activities of others ..., the Act specifically grants a remedy to non-injured persons suing on behalf of the public." *Id.* at 1229. Under both holdings, RITE has standing to maintain this action.

Similarly, in *J. E. Brenneman Co. v. Schramm*, 473 F.Supp. 1316 (E.D.Pa.1979),

---

ure by all or large classes of citizens." R., Vol. VI, 1304. In *Schlesinger*, Chief Justice Berger, for the Court, said "[t]he District Court made analogy to conflict-of-interest statutes which, it said, are directed at avoiding circumstances of potential, not actual, impropriety. *We have no doubt that if the Congress enacted a statute creating such a legal right, the requisite injury for standing would be found in an invasion of that right.*" *Id.*, 418 U.S. at 224, n. 14, 94 S.Ct. at 2933, n. 14 (emphasis supplied).

**13.** Although the Supreme Court granted certiorari on October 10, 1980, oral argument was held on February 24, 1981, and a decision prob-

ably will be issued shortly, the order granting certiorari, —— U.S. ——, 101 S.Ct. 314, 66 L.Ed.2d 145 (1980), clearly indicates that the Court limited the grant of the petitions for writs of certiorari to issues in the cases other than the question of standing under sections 505(a) and (b) of the FWPCA, 33 U.S.C. §§ 1365(a), (b). Therefore, our discussion of *National Sea Clammers Association v. New York, supra,* and our reliance on the analysis set forth therein are not diminished in our view by the fact that a Supreme Court appeal is pending.

the court considered an action by a contractor against a regional administrator of the Environmental Protection Agency alleging that the administrator had failed to perform a nondiscretionary duty required under the FWPCA. Although the court held that the contractor lacked standing, the court so held because of its finding that the contractor had not been "injured in fact" within the meaning of *Sierra Club*. Furthermore, the court based its holding upon a line of cases which had defined Section 505 in relation to *Sierra Club*:

> In discussing standing to initiate a citizen suit under the FWPCA, the court in *Loveladies Property Owners Ass'n, Inc. v. Raab*, 430 F.Supp. 276 (D.N.J.1975), *aff'd*, 547 F.2d 1162 (3d Cir. 1976), *cert. denied*, 432 U.S. 906, 97 S.Ct. 2949, 53 L.Ed.2d 1077 (1977), relied upon the Supreme Court's decisions in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and *Association of Data Processing Service Organizations v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), in requiring a plaintiff to show direct and specific injury arising out of the act complained of. *See Montgomery Environmental Coalition v. Fri*, 366 F.Supp. 261, 264 (D.D.C.1973).

*Id.* at 1319–20. Accordingly, we hold that RITE has standing pursuant to Section 505(a) to maintain this suit.

 Appellees argue, however, that Section 505 may not be invoked where the alleged misconduct involved a duty which was "discretionary" under the Act. 33 U.S.C. § 1365(a)(2). Putting aside the flawed logic in appellee's contrary assertions that the Administrator had no authority to permit a demonstration project which was discretionary under the Act, this court still cannot accept the EPA's contention. While we fully recognize that this court has no authority to direct the Administrator to *grant* petitioner a permit under 33 U.S.C. § 1255, the ultimate decision on the merits of such applications being within the Ad-

ministrator's discretion, this court does have authority to direct the Administrator to *consider fully* petitioner's application on the merits. The Administrator has no discretion to reject, out of hand, applications under 33 U.S.C. § 1255; neither does the Administrator have discretion to impose arbitrary geographical limitations which were never intended by Congress.

## VI. *Remand to Gather Facts Relating to Mootness*

In remanding this case to the district court we fully recognize that the City of Miami Beach has not had the luxury of standing still during the pendency of this litigation. As supplemental pleadings have shown, the transmission line from the City of Miami Beach to the secondary sewage treatment plant on Virginia Key is now completed.[14] Therefore, upon remand, we offer the following suggestions to the district court on the subject of mootness.

First, the district court should determine whether the State of Florida, any municipality or intermunicipal or interstate agency[15] wishes to file an application for the deep ocean outfall alternative. If such an applicant is not available, the case becomes moot. If, however, one of these governmental bodies wishes to proceed, the district court should determine whether the Environmental Protection Agency continues to interpret and apply the Clean Water Act of 1977 in a manner inconsistent with the law by imposing geographical limitations upon the deep ocean outfall alternative. While the record on appeal satisfies this court that, during the pendency of the litigation, the EPA improperly interpreted the Act, this court has no way of ascertaining whether the EPA has abandoned this interpretation subsequent to compilation of the record.

Should the trial court determine both of the above questions in the affirmative, the third question regarding mootness would be whether a waiver can be obtained under

---

**14.** *See* Affidavit of Garrett Sloan, Director of the Miami-Dade Water and Sewer Authority, filed December 1, 1980.

**15.** *See* 33 U.S.C. § 1255(a).

Florida law which will permit the municipality to execute the proposed project. Under Fla.Stat. § 403.086(2),[16] secondary treatment is mandated within the state for all sewage disposal, and under the FWPCA a state has the right to impose standards which are more restrictive than the federal standards. Nevertheless, under Fla.Stat. § 403.201 an applicant may obtain a variance to the secondary treatment requirement. The court cannot, at this stage in the litigation, presume that appellant's contentions are moot because appellant has never been given an opportunity to obtain a variance under Florida law.

Finally, we note that the City of Miami Beach remains, technically, a party defendant to this action. Appellant points out, however, that numerous pleadings submitted by the City evidence that the City desired to withdraw its June 23, 1977, motion for summary judgment in favor of defendants. Specifically, RITE directs the court's attention to the November 19, 1977, "Notice of Filing Minutes of the City Commission" in which the City stated that "plaintiff has standing to maintain this suit and defendant, City, prays this court to define the legal issues involved on their legal merits," and a January 5, 1978, Motion for Expediting Cause requesting the same.[17] Furthermore, at oral argument, counsel for the City of Miami Beach maintained that the City considered its interests to be allied with appellant's. Therefore, we choose to regard the above described pleadings as motions by the City to realign itself as a party plaintiff.

The record on appeal makes evident the confusion and frustration which the City Commission encountered after initially filing its application with the government. The gravamen of the wrong in this lawsuit arose from the manner in which the government responded to the City's application, a response which this court believes amounted to an abuse of power. By rejecting the

application out of hand, the Environmental Protection Agency placed the City of Miami Beach in an impossible situation—either sue the government in order to save municipal funds and thereby lose federal funds, or withdraw suit and thereby needlessly expend municipal funds for secondary treatment.

Trapped, as it were, between Scylla and Charybdis, it is not surprising that the City's pleadings trace a path of party alignment and realignment which make it appear as if the City were led by a mysterious "sirenian" call. In this context, it seems clear that the City encouraged RITE to pursue a battle which it believed it could not by itself win. The Commission repeatedly requested RITE's president, Joseph Abelow, and RITE's legal counsel, Joseph Fleming, to address the Commission regarding the status of RITE's lawsuit in order to discover whether RITE could prevail where the City had failed. Furthermore, lengthy council meetings ensued during which the Commissioners debated various strategies whereby the municipality could find a way out of its dilemma without actually joining RITE's suit. Given these practicalities, it would be a distortion of the truth to consider the City to be a party defendant, and we therefore acknowledge the fact that the City's interests were fundamentally allied with the plaintiff, and accordingly treat the City as a party plaintiff upon remand.

REVERSED and REMANDED.

16. Fla.Stat. 403.086(2) provides in pertinent part:

Any facilities for sanitary sewage disposal existing on July 1, 1971, shall provide for secondary waste treatment by January 1, 1973, . . . .

17. R., Vol. VI, 1246.