**SIERRA CLUB,**
Plaintiff-Appellant-Cross-Appellee,

v.

**SCM CORPORATION,**
Defendant-Appellee-Cross-Appellant.

No. 1410, Dockets 84–7241,
84–7261.

United States Court of Appeals,
Second Circuit.

Argued June 27, 1984.

Decided Oct. 29, 1984.

Anthony Z. Roisman, Washington, D.C. (Ellen Barry, Trial Lawyers for Public Justice, Washington, D.C., on the brief), for plaintiff-appellant-cross-appellee.

Ragna Henrichs, Rochester, N.Y. (Richard M. Cogen, M. Kathryn Sedor, Judy A. Toyer, Nixon Hargrave, Devans & Doyle, Rochester, N.Y., on the brief), for defendant-appellee-cross-appellant.

Robert Abrams, Atty. Gen., of the State of New York, Albany, N.Y. (Kathleen Liston Morrison, Asst. Atty. Gen., Albany, N.Y., of counsel), filed a brief for amicus curiae State of New York.

Hunton & Williams, Richmond, Va. (William B. Ellis, William L. Rosbe, K. Dennis Sisk, of counsel), filed a brief for amici curiae Alabama Power Company, et al.

Stark Ritchie, James K. Jackson, and Thomas S. Llewellyn, Washington, D.C., filed a brief for amicus curiae American Petroleum Institute.

Peter M. Collins and John G. Collins, New York City, filed a brief for amici curiae Norman A. Foster and the Mid-Atlantic Legal Foundation.

Before KEARSE, PIERCE, and MARKEY,* Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Sierra Club ("Sierra") appeals from a judgment of the United States District Court for the Western District of New York, Michael A. Telesca, *Judge*, dismissing for lack of standing its suit against defendant SCM Corporation ("SCM") for discharge of excessive pollutants into a tributary of Wolcott Creek in Wolcott, New York, in violation of the Clean Water Act, 33 U.S.C. §§ 1251–1376 (1982) (the "Act"). In an opinion reported at 580 F.Supp. 862 (1984), the court held that Sierra lacked standing to bring suit under § 505 of the Act, 33 U.S.C. § 1365, because Sierra neither alleged that it suffered an appropriate "injury in fact" nor identified any of its members alleged to have suffered such injury. On appeal, Sierra argues principally that, as an organization committed to preventing unpermitted pollution of the aquatic environment, it has been given standing by the Act to bring suit, and that any requirement that it identify a Sierra Club member injured by SCM's alleged pollution would violate that member's First Amendment rights to privacy and freedom of association. SCM cross-appeals, urging that if we conclude that plaintiff has standing, we should reverse the district court's denial of SCM's motion under 33 U.S.C. § 1365(b)(1)(B) to dismiss on the ground that state proceedings on the same facts

---

* Honorable Howard T. Markey, Chief Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

have deprived the federal court of jurisdiction. For the reasons below, we affirm the judgment of the district court, and we therefore dismiss the cross-appeal as moot.

## I. BACKGROUND

According to the complaint, Sierra is a national nonprofit conservation organization with more than 300,000 members dedicated to protecting natural resources, including water. SCM, through its Durkee Famous Foods Division ("Durkee"), owns and operates an onion and potato processing plant in Wolcott, New York. SCM has a National Pollutant Discharge Elimination System/State Pollutant Discharge Elimination System ("NPDES/SPDES") permit, issued pursuant to § 402 of the Act, 33 U.S.C. § 1342, allowing it to discharge limited amounts of pollutants. The complaint alleged that SCM had repeatedly discharged into a tributary of Wolcott Creek pollutants in volumes exceeding those allowed by its permit.

Sierra predicated federal jurisdiction on § 505 of the Act, 33 U.S.C. § 1365, which authorizes a citizen to bring a suit in the district court "on his own behalf" against a person alleged to be in violation of the Act.[1] Sierra set out its interest in the present suit as follows:

> Members of the Sierra Club reside in New York, in the vicinity of the unnamed tributary of Wolcott Creek into which Defendant's wastes are discharged, or own property or recreate in, on or near' the unnamed tributary of Wolcott Creek. The quality of the nation's waters and the waters of the State of New York directly affects the health, economic, recreational, aesthetic, and environmental interest of the Sierra Club's members. The interests of Sierra Club's members have been, are being and will be adversely affected by the Defendant SCM Corporation—Durkee Famous Foods Division's failure to comply with its NPDES/SPDES permit requirements.

(Complaint ¶ 7.) Sierra requested declaratory and injunctive relief; the imposition on SCM of civil penalties of $10,000 per day of violation, payable to the government; and an award to Sierra of costs, including fees for attorneys, witnesses, and consultants.

SCM moved to dismiss the complaint on the grounds, *inter alia*, that the court

---

1. Section 505 of the Act, 33 U.S.C. § 1365, provides in part as follows:

§ 1365. Citizen Suits

(a) Authorization; jurisdiction

Except as provided in subsection (b) of this section, any citizen may commence a civil action on his own behalf—

(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent per-. mitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, or

(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this chapter which is not discretionary with the Administrator. The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 1319(d) of this title.

(b) Notice

No action may be commenced—

(1) under subsection (a)(1) of this section—

(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order, or

(B) if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States, or a State to require compliance with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

(2) under subsection (a)(2) of this section prior to sixty days after the plaintiff has given notice of such action to the Administrator, except that such action may be brought immediately after such notification in the case of an action under this section respecting a violation of sections 1316 and 1317(a) of this title. Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation. * * * *

(g) Citizen

For the purposes of this section the term "citizen" means a person or persons having an interest which is or may be adversely affected.

lacked jurisdiction by reason of the conclusion of state proceedings on the same facts. It asserted that prior to the present suit, the New York State Department of Environmental Conservation ("NYDEC") had commenced an administrative proceeding against SCM resulting in the entry against SCM of a consent order resolving all of the violations alleged in Sierra's complaint. SCM argued that Sierra's action was thus precluded by § 505(b)(1)(B) of the Act, 33 U.S.C. § 1365(b)(1)(B), *see* note 1 *supra,* which provides that a private civil action may not be maintained if the appropriate state agency has commenced and is diligently prosecuting a civil action in state or federal court to require compliance with the Act.

The district court denied SCM's motion to dismiss, in an opinion reported at 572 F.Supp. 828 (1983), and a number of procedural maneuvers followed. SCM sought certification of the jurisdiction issue for immediate appeal pursuant to 28 U.S.C. § 1292(b). Sierra responded with a motion for partial summary judgment on the issue of SCM's liability. SCM then served on Sierra a set of "Interrogatories Related to Standing," requesting identification of each Sierra Club member who resided, owned property, or recreated in the vicinity of the tributary; or whose health or economic, recreation, or aesthetic interests had been adversely affected by its pollution. For each person listed in response, SCM asked the dates and places of the uses made of the tributary and the manner in which SCM's conduct had affected those uses. Sierra did not answer the interrogatories, but instead sought a protective order and moved for partial summary judgment on the standing issue. Sierra contended that the interrogatories were burdensome and irrelevant and would be moot upon the granting of Sierra's motions for partial summary judgment.

In support of its motion on the standing issue, Sierra submitted the affidavit of its litigation coordinator, stating, *inter alia,* that more than 2,200 members of Sierra resided within 70 miles of the Durkee plant and that one Sierra member resided in Wolcott. Sierra also submitted copies of its bylaws and other materials describing its activities and the manner in which it decided to undertake litigation. In response, SCM argued that, as Sierra apparently did not intend to come forth with any factual showing of injury to itself or to identify any of its members claimed to suffer injury as a result of the alleged pollution, Sierra's motion for summary judgment on the issue of standing should be denied, and summary judgment on that issue should be entered in favor of SCM. At oral argument, Sierra argued that it had standing because it was interested in preserving the environment, that harm to Sierra was shown simply by the failure of SCM to comply with the Act; and that Congress had given any person with an interest such as that of Sierra a right to sue any person alleged to have violated the Act. Sierra indicated that it did not intend to identify any of its members who might have been harmed by the alleged violation. After hypothesizing the burdens to any member so identified and subjected to discovery proceedings, counsel for Sierra responded as follows to probing by the court:

> THE COURT: But there is no question that you haven't identified the parties who are harmed, nor do you intend to.
>
> MR. ROISMAN: Let me be clear about this Your Honor. Our position is that the parties who have been harmed do not have to be identified for any legitimate purposes the defendant has....

(Transcript of hearing, February 23, 1984, at 11.)

The district judge rejected Sierra's arguments and ruled that it lacked standing to bring the suit. Relying on *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), the court concluded that since "plaintiff has failed to show that any particular member of its organization has or may be adversely affected in any specific way by defendant's actions," Sierra's assertions of injury in fact were unsupported. 580 F.Supp. at 865. Accordingly, the court denied Sierra's motions for summary judgment. On the premise that "it

would be a poor utilization of judicial resources to allow plaintiff yet another chance to come forward with" factual support, the court dismissed the complaint. *Id.* Sierra promptly appealed.

## II. DISCUSSION

On appeal, Sierra contends that Congress intended § 505 of the Act to confer standing on an organization such as Sierra to bring suit on the basis of its institutional interest in the preservation of the environment and that that institutional interest constitutes "injury in fact" within the meaning of standing doctrine. It also contends that any requirement that it disclose the names of members directly injured by the alleged pollution would violate the First Amendment rights of those individuals to privacy and freedom of association. SCM has cross-appealed, contending that the district court should have granted its motion to dismiss for lack of jurisdiction in light of the NYDEC consent order.

For the reasons below, we conclude that a general interest in environmental preservation as shown here by Sierra does not constitute injury in fact or satisfy the standing requirements of the Act. Any contention that Sierra is excused from making a proper showing of injury in fact by reason of the First Amendment rights of its members has been waived by Sierra's failure to make such an argument in the district court. We thus affirm the dismissal of the complaint for lack of standing. We dismiss SCM's cross-appeal as moot.

### A. *The Standing Requirement of § 505*

 The doctrine of standing in the federal courts delimits the persons who are permitted to challenge the legality of an act. The doctrine is informed by constitutional, prudential, and legislative concerns. The constitutional limits on standing are grounded in the requirement of Article III that the federal courts adjudicate only actual cases or controversies, *e.g., Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 37–38, 96 S.Ct. 1917, 1923–1924, 48 L.Ed.2d 450 (1976), and such limi-

tations require that the would-be plaintiff show injury in fact, *i.e.,* "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979). Prudential concerns may further limit the class of those permitted to sue, as where "the judiciary seeks to avoid deciding questions of broad social import where no individual rights would be vindicated," *id.* at 99–100, 99 S.Ct. at 1607–1608, and thus requires that the plaintiff's injury be "peculiar to himself or to a distinct group of which he is a part, rather than one 'shared in substantially equal measure by all or a large class of citizens,'" *id.* at 100, 99 S.Ct. at 1608 (quoting *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975)). Finally, Congress may grant a right to sue to those who meet the constitutional limitations on standing but who might otherwise be barred by prudential limitations. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. at 100, 99 S.Ct. at 1608. Congress may not, however, "abrogate the Art. III minima: A plaintiff must always have suffered 'a distinct and palpable injury to himself,' ... that is likely to be redressed if the requested relief is granted." *Id.* (quoting *Warth v. Seldin,* 422 U.S. at 501, 95 S.Ct. at 2206, and citing *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. at 38, 96 S.Ct. at 1924); *accord Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472–73, 102 S.Ct. 752, 758–59, 70 L.Ed.2d 700 (1982).

Sierra contends that it has standing under § 505 of the Act. Evaluation of its contention requires consideration of whether the Act evinces an intention by Congress to confer standing on groups such as Sierra and whether such a bestowal, if inferrable, is consistent with the Article III minima.

Section 505(a) of the Act provides, in pertinent part, that "any citizen may commence a civil action on his own behalf"

against a person alleged to have violated the Act. Section 505(g) provides that the term "citizen," as used in § 505(a), "means a person or persons having an interest which is or may be adversely affected." 33 U.S.C. § 1365(g). The legislative history of this provision, discussed in greater detail below, reveals that Congress intended these provisions to confer standing in accordance with the principles set out in the then-recent Supreme Court decision in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (*"Morton"*).

In *Morton*, Sierra sought declaratory and injunctive relief against the proposed construction of recreational facilities in a quasi-wilderness park area. It brought its suit against the United States Secretary of the Interior under § 10 of the Administrative Procedure Act ("APA"), 5 U.S.C. § 702 (1982), which provided that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." The injury alleged by Sierra was that the development of the recreational facilities "would destroy or otherwise adversely affect the scenery, natural and historic objects and wildlife of the park and would impair the enjoyment of the park for future generations." *Morton*, 405 U.S. at 734, 92 S.Ct. at 1365. The Court had no doubt that this type of harm—*i.e.*, injury to aesthetic and environmental well being, as contrasted with injury to economic interests—could amount to "injury in fact" sufficient to satisfy § 10 of the APA. 405 U.S. at 734, 92 S.Ct. at 1365. It concluded, however, that Sierra had not shown injury in fact because it had failed to allege that it or any of its members used the park or would be affected in any of their activities or pastimes by the proposed development. The Court stated that "the 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." *Id.* at 734–35, 92 S.Ct. at 1365–66.

The *Morton* Court recognized that an organization whose members were injured could sue on their behalf; but it ruled that an organization whose members were not injured but merely interested could not:

[A] mere "interest in a problem," no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization "adversely affected" or "aggrieved" within the meaning of the APA. The Sierra Club is a large and long-established organization, with a historic commitment to the cause of protecting our Nation's natural heritage from man's depredations. But if a "special interest" in this subject were enough to entitle the Sierra Club to commence this litigation, there would appear to be no objective basis upon which to disallow a suit by any other bona fide "special interest" organization, however small or short-lived. And if any group with a bona fide "special interest" could initiate such litigation, it is difficult to perceive why any individual citizen with the same bona fide special interest would not also be entitled to do so.

The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process. It does serve as at least a rough attempt to put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome. That goal would be undermined were we to construe the APA to authorize judicial review at the behest of organizations or individuals who seek to do no more than vindicate their own value preferences through the judicial process.

*Id.* at 739–40, 92 S.Ct. at 1368–69 (footnotes omitted).

Shortly after the Supreme Court decided *Morton*, Congress passed the Clean Water Act. The standing provision of § 505 was fashioned by a Conference Committee, and the report of the Committee stated "the

understanding of the conferees that the conference substitute relating to the definition of the term 'citizen' reflects the decision of the U.S. Supreme Court in the case of *Sierra Club v. Morton.*" S.Conf.Rep. No. 1236, 92d Cong., 2d Sess. 146, *reprinted in* 1972 U.S.Code Cong. & Ad.News 3776, 3823, *and in* 1 Senate Comm. on Public Works, 93d Cong., 1st Sess., *A Legislative History of the Water Pollution Control Act Amendments of 1972*, at 281, 329 (1973) [hereinafter cited as "Legislative History"].

The floor debate in the House regarding the Conference Report elaborated as follows:

> The House bill—H.R. 11896—severely restricted the citizen suit provision in its definition of the term "citizen." This is noted on page 134 of the House committee's report ... as follows:
>
>> Subsection (g) defines the term "citizen" to mean (1) a citizen of the geographic area having a direct interest which is or may be affected and (2) any group of persons which has been actively engaged in the administrative process and has thereby shown a special interest in the geographic area in controversy.
>
> . . . .
>
> But the conferees, quite properly, abandoned this restrictive language in favor of language defining a citizen as "a person or persons having an interest which is or may be adversely affected."

This language is based on section 10 of the Administrative Procedure Act, 5 U.S.C. 702, and the interpretation given to that section by the Supreme Court in *Sierra Club v. Morton....* The case was decided in April 1972, 3 weeks after H.R. 11896 passed the House in March 1972 ....

In Sierra Club, the Supreme Court held that under the APA "the party seeking review" must himself be "among the injured" by the action or inaction complained of. Most importantly, the Court held that noneconomic injury to an environmental interest is sufficient to meet the APA test ....

The conferees followed the Court's opinion. A citizen suit may be brought under the conference agreement by those persons or groups which are among those whose environmental—that is, esthetic, conservational, ...—interest is or may be injured by a violation of the act or a failure to perform a duty under the act which is the basis of the suit. 1 Legislative History, *supra*, at 249–50 (remarks of Rep. Dingell).

The legislative history thus leads to the conclusion that § 505(g)'s definition of "citizen" as a "person or persons having an interest which is or may be adversely affected," means those who can claim injury in fact within the meaning of *Morton*.

Sierra urges us to reach the contrary conclusion on the grounds, *inter alia*, that, in adopting § 505, Congress rejected the earlier House proposal that was more restrictive, and that a statement by Senator Muskie, chairman of the Senate Subcommittee on Air and Water Pollution, suggested that a person need only have an interest in the matter in litigation in order to bring suit. We have considered all of the arguments made by Sierra and find none of them persuasive.

The fact that the Conference rejected the House version, which would have permitted suits only by citizens of the geographic area who were directly affected or by groups that had been involved in administrative proceedings with respect to the challenged activity, did not mean that the Conference abandoned all restrictions. The Conference report and the floor statement set forth above plainly demonstrate that Congress was adopting the constraints set forth in *Morton*.

Sierra's contention that Senators Muskie and Bayh "summarized the essence of Section 505 as it was agreed to in conference" (Sierra brief on appeal at 30) is likewise flawed. In support, Sierra quotes to us the following colloquy:

Mr. BAYH.... Would an interest in a clean environment which would be invaded by a violation of the [Act] or a permit thereunder—be an "interest" for purposes of this section?

Mr. MUSKIE. That is the intent of the conference ...

(*Id.;* ellipses in brief). Senator Muskie's oral response did not end there, however. He stated as follows:

> That is the intent of the conference, as I am sure the Senator from Indiana well knows. The conference report states:
>
> "It is the understanding of the conferees that the conference substitute relating to the definition of the term "citizen" reflects the decision of the U.S. Supreme Court in the case of Sierra Club v. Morton (No. 70–34, April 19, 1972)."
>
> In the Sierra Club case, the Supreme Court was asked to interpret section 10 of the Administrative Procedures [*sic*] Act—5 U.S.C., section 702—which contains wording similar to that of section 505(g) of the conference bill. The Supreme Court emphasized that "the *interest alleged to have been injured* may reflect aesthetic conservational and recreational as well as economic values." The Court also said:
>
> "Aesthetic and environmental well-being, like economic well-being, are important ingredients of the quality of life in our society, and the fact that particular environmental interests are shared by the many rather than the few does not make them less deserving of legal protection through the legal process."
>
> Thus it is clear that under the language agreed to by the conference, a noneconomic interest in the environment, in clean water, is a sufficient base for a citizen suit under section 505.
>
> Further, every citizen of the United States has a legitimate and established interest in the use and quality of the navigable waters of the United States. Thus, I would presume that a citizen of the United States, regardless of residence, would have an interest as defined in this bill regardless of the location of the waterway and regardless of the issue involved.

1 Legislative History, *supra*, at 221 (emphasis added). Taken in context, we regard Senator Muskie's remarks as endorsing the view that Congress was incorporating into § 505 *Morton*'s view of standing, *i.e.*, that although the interest might be noneconomic, the plaintiff had to show that his own interest was injured. Further, Senator Muskie made this view unmistakably clear in a written statement as follows:

> In *Sierra Club*, the Supreme Court held that under the A.P.A. the *party seeking review must itself be among those injured* by the action or inaction complained of.... Thus *under the language agreed to by the Conference a citizen suit may be brought only by those persons or groups which are among those whose interest* (whether environmental or economic) *is or may be injured* by the violation of the Act which is the basis of the suit.

1 Legislative History, *supra*, at 161, 179 (written remarks of Senator Muskie to Senate upon presentation of Conference Report; emphasis added).

If there were a conflict between the remarks of a single legislator and the statement in the legislative committee's formal report on enactment of the provision, we would regard the formal report as controlling. *See Chrysler Corp. v. Brown,* 441 U.S. 281, 311, 99 S.Ct. 1705, 1722, 60 L.Ed.2d 208 (1979). Here we regard both the Conference report and the views of Senator Muskie as consistently demonstrating that standing under § 505 was intended to be limited to those who can show that their interest, whether environmental or economic, is or may be injured by the alleged violation of the Act.

This interpretation of § 505 is supported by the ruling of the Supreme Court in *Middlesex County Sewerage Authority v. National Sea Clammers Association,* 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). There, in construing § 505, the Court stated that

it is clear that the citizen-suit provisions apply only to persons who can claim some sort of injury .... "Citizen" is defined in the citizen-suit section of the [Act] as "a person or persons having an interest which is or may be adversely affected." § 505(g), 33 U.S.C. § 1365(g). It is clear from the Senate Conference Report that this phrase was intended by Congress to allow suits by all persons possessing standing under this Court's decision in *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). See S.Conf.Rep. No. 92–1236, p. 146 (1972).

*Id.* at 16–17, 101 S.Ct. at 2624–2625.[2]

█ Accordingly, we conclude that Sierra could establish standing under § 505 only by showing actual injury *within the meaning of Morton*, by, for example, providing a concrete indication that Sierra or one or more of its members used the Wolcott Creek tributary or would be affected by its pollution. Sierra has, however, refused to come forward with any such showing, asserting only that it has members residing within a 70-mile radius of the tributary and one member living in Wolcott, and preferring to rest its standing claim on its contention that an injury to its interests is established by any violation of the Act. Here, as in *Morton*, "[t]he Club apparently regard[s] any allegations of individualized injury as superfluous, on the theory that

this was a 'public' action involving questions as to the use of natural resources, and the Club's longstanding concern with and expertise in such matters were sufficient to give it standing as a 'representative of the public.'" 405 U.S. at 736, 92 S.Ct. at 1367 (footnote omitted).[3] The Supreme Court squarely rejected this basis for standing, and we are constrained to do the same.

### B. The First Amendment Claim

█ Sierra argues in this Court that it should be excused from having to identify any of its members whose interests have been or may be injured by the alleged violations on the grounds that such disclosure would pose an unreasonable burden by subjecting the members to depositions and court appearances and would thereby offend the members' First Amendment rights to privacy and freedom of association. This contention need not detain us long, since Sierra did not raise it before the district court. Neither Sierra's motion for a protective order permitting it to delay answering or objecting to the interrogatories served on it by SCM nor its arguments to the district court on the motions for summary judgment made any suggestion that Sierra was asserting a constitutional privilege. Sierra argued only questions of

---

**2.** Sierra relies heavily on the decision in *RITE-Research Improves the Environment, Inc. v. Costle*, 650 F.2d 1312, 1319–21 (5th Cir.1981), for the proposition that the Act gave it standing to sue for any violation. The statements on which Sierra relies were based largely on the reasoning of the Third Circuit in the *Sea Clammers* case, which was thoroughly rejected by the Supreme Court. *See* 453 U.S. at 14–17, 101 S.Ct. at 2623–2625.

Sierra also argues that the Act confers upon it the status of a "private attorney general" who need not show injury in order to bring suit. This argument misunderstands the role of a private attorney general by confusing the question of the nature of the plaintiff's interest with the issue of whether injury to that interest has been shown. The Supreme Court pointed out in *Sea Clammers* that private attorneys general differ from other plaintiffs not because they need not show injury, as Sierra contends, but because their "injuries are 'noneconomic' and probably

noncompensable." 453 U.S. at 17, 101 S.Ct. at 2624. The Court made clear that even private attorneys general must show injury in fact, stating that "Congress intended the limitations imposed on citizen suits to apply to all private suits under the [ ] Act[ ]." *Id.* (footnote omitted).

**3.** Compare *Morton*, in which Sierra had refused to show injury in fact, with *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 678–81, 93 S.Ct. 2405, 2411–12, 37 L.Ed.2d 254 (1973), in which an environmental group challenged the enforcement of a railroad freight surcharge which, the group asserted, would prompt increased use of non-recyclable materials, resulting in, *inter alia,* a greater volume of refuse in a certain area. The Supreme Court recognized SCRAP's standing, noting that the group claimed that its members used the area recreationally. *Id.* at 683–90, 93 S.Ct. at 2413–17.

burden and relevance. The First Amendment contentions have thus been waived. *See, e.g., United States v. Di Stefano*, 555 F.2d 1094, 1100 n. 5 (2d Cir.1977); *United States v. Rollins*, 522 F.2d 160, 165 (2d Cir.1975), *cert. denied*, 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976).

### C. *Appellate Relief*

 Finally, Sierra appears to urge that if we agree with the district judge's view that it has not shown standing, we should give Sierra an opportunity to provide additional information about its members in order to meet the injury in fact requirements. We decline to grant Sierra this relief. Sierra never indicated to the district judge that it would provide such information if the judge ruled that that was the only condition on which Sierra would be allowed to pursue this litigation. Indeed, on explicit questioning by the court during the oral argument of the summary judgment motions, Sierra's counsel confirmed the court's understanding that Sierra would refuse to provide such information. Nor did Sierra alter its stance after the court ordered the entry of summary judgment against it, by seeking a modification of the order to provide that Sierra could disclose the required information and thus pursue the suit. Instead, a week after the order was entered, Sierra filed this appeal. We have little doubt that had Sierra requested such a modification of the order the district court would have granted it. Such an order, however, would not have been appealable, and we regard Sierra's strategy of bypassing its opportunities to obtain relief in the district court and requesting such relief on appeal as an attempt to circumvent the final-judgment rule. We decline to reward such an attempt.

### CONCLUSION

The judgment of the district court dismissing the complaint is affirmed. The cross-appeal is dismissed as moot.