**SIERRA CLUB, Plaintiff,**

v.

**The ALUMINUM COMPANY OF AMERICA, Defendant.**

**No. 82–CV–1304.**

United States District Court, N.D. New York.

March 15, 1984.

any attempts to change this policy are best left to the executive and legislative branches.

Trial Lawyers for Public Justice, P.C., Washington, D.C., for plaintiff; Anthony Z. Roisman, Washington, D.C., of counsel.

LeBoeuf, Lamb, Leiby & MacRae, New York City, for defendant; Marlene W. Jackson, Pittsburgh, Pa., Grant S. Lewis, Howard S. Ockman, New York City, of counsel.

### MEMORANDUM–DECISION and ORDER

MINER, District Judge.

#### I

This action, brought pursuant to section 505 of the Federal Water Pollution Control Act ("FWPCA"), 33 U.S.C. § 1365, challenges alleged violations by defendant Aluminum Company of America ("Alcoa") of its National Pollutant Discharge Elimination System permit. Jurisdiction is predicated upon section 505(a)(1) of the FWPCA, 33 U.S.C. § 1365(a)(1). Before this Court are motions by defendant to dismiss the complaint for failure to state a claim upon which relief can be granted, Fed.R.Civ.P. 12(b)(6), or, in the alternative, for partial summary judgment, Fed.R.Civ.P. 56(b).

#### II

Plaintiff Sierra Club is a non-profit corporation organized in 1892 under the laws of the state of California. The Sierra Club is a national public interest organization dedicated to protecting the environment. With offices throughout the nation, it operates as a representative of its more than 300,000 members in conserving and protecting the country's natural resources for the benefit of the general public.

Defendant Alcoa is a Pennsylvania corporation operating an aluminum production facility in Massena, New York. This facility discharges the treated wastes from its operations into the Grass River, the Old Power Canal, and the St. Lawrence River. These discharges are controlled by the

terms of a waste water discharge permit issued pursuant to federal and state laws which prohibit all waste discharges except as authorized by a valid permit. Generally, states issue permits pursuant to a State Pollutant Discharge Elimination System ("SPDES") program which is authorized and approved by the Administrator of the Environmental Protection Agency ("EPA") as provided by the National Pollutant Discharge Elimination System ("NPDES") provision of the FWPCA, 33 U.S.C. § 1342(b). Under that section, the Administrator of the EPA has authorized the New York State Department of Environmental Conservation ("Department") to issue NPDES/SPDES permits. On January 31, 1975, the Department, pursuant to §§ 17–0801 to –0819 of the New York Environmental Conservation Law, issued Alcoa NPDES/SPDES permit number NY 0001732, permitting it to discharge limited quantities of pollutants into the Grass River and the Old Power Canal.

Section 308 of the FWPCA, 33 U.S.C. § 1318, requires holders of NPDES/SPDES permits to establish and maintain records, install, use and maintain monitoring equipment, sample effluents, and report on a regular basis to the permit-issuing agency regarding the facilities' discharge of pollutants. The reports consist of Discharge Monitoring Reports and Non-Compliance Reports. The EPA and the Department then prepare quarterly reports which discuss in general terms which permit holders are not complying with permit conditions.

After reviewing these reports of defendant, and perceiving the absence of any diligent prosecution of defendant by federal or state authorities, plaintiff commenced this action on November 23, 1982. Prior to filing the complaint, and pursuant to section 505(b) of the FWPCA, 33 U.S.C. § 1365(b), plaintiff, on September 17, 1982, notified Alcoa, the EPA, and the Department of defendant's longstanding and continuous violations of its NPDES/SPDES permit and of its intent to sue Alcoa unless within sixty days (the statutorily mandated waiting period, 33 U.S.C. § 1365(b)(2)), action was taken to redress the identified problems. In its notice letter, plaintiff identified over 615 violations of the Alcoa permit that had occurred between July of 1977 and December of 1981. Most of the violations involved fluoride and copper, both highly toxic substances, and many of Alcoa's violations exceeded five times the permit limits.

Based on these alleged violations, plaintiff seeks, *inter alia*, an injunction enjoining defendant from operating its Massena plant in such a way as would result in further permit violations, as well as payment of civil penalties of $10,000 per day of violation for each violation, 33 U.S.C. §§ 1319(d), 1365(a). Defendant has moved to dismiss the instant complaint, claiming that the Sierra Club is without standing to seek enforcement of section 505 of the FWPCA, 33 U.S.C. § 1365.[1] In the alternative, defendant has moved for partial summary judgment as to much of plaintiff's complaint as alleges violations of an expired permit.

### III

#### A. *Sierra Club's standing*

■ In support of its contention that the Sierra Club lacks standing to maintain the present action, Alcoa advances two arguments. First, Alcoa claims that because the Sierra Club has conceded in a stipulation between the parties that its claim to standing in this litigation is not based on injury to itself but rather on its capacity as a representative of its members, the Sierra Club lacks standing as a matter of law since section 505(a) of the FWPCA, 33 U.S.C. § 1365(a), authorizes only suits brought by a plaintiff "on his own behalf." Second, Alcoa argues that even if an organization acting as a representative may maintain an action under section 505(a), the

---

1. Since the motion is made pursuant to Fed.R. Civ.P. 12(b)(6), the factual allegations contained in the complaint must be taken as true. *Kugler v. Helfant*, 421 U.S. 117, 125 & n. 5, 95 S.Ct. 1524, 1531 & n. 5, 44 L.Ed.2d 15 (1975); *Fine v. City of New York*, 529 F.2d 70, 75 (2d Cir.1975).

Sierra Club is not acting as a proper representative of its members in the case at bar. Treating each of these arguments in turn, this Court is persuaded that plaintiff does in fact possess the requisite standing to maintain the present suit.

### 1. *Statutory standing*

■ The starting point for this Court's analysis must begin with the relevant wording of the statute here at issue. Section 505(a) of the FWPCA provides that:

(a) Except as provided in subsection (b) of this section, any citizen may commence a civil action *on his own behalf*—

(1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation ....

33 U.S.C. § 1365(a) (emphasis added).

The parties do not dispute the now familiar principle that under article III of the Constitution, an association "may have standing in its own right to seek judicial relief from injury to itself ...." *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). Nor do the parties take issue with the corollary principle that, under certain circumstances, an association which cannot show injury to itself may nevertheless have standing under the Constitution since "[e]ven in the absence of injury to itself, an association may have standing solely as the representative of its members." *Id.* Defendants, however, argue that in enacting legislation, Congress often does not exercise its full constitutional power in conferring standing to sue. Noting that where there is a specific statutory provision defining standing, "the inquiry as to standing must begin with a determination of whether the statute in question authorizes review at the behest of the plaintiff," *Sierra Club v. Morton,* 405 U.S. 727, 732, 92 S.Ct. 1361, 1365, 31 L.Ed.2d 636 (1972) (footnote omitted), defendant urges that in enacting the 1977 amendments to the Clean Water Act,

Congress did not confer a right to sue upon all parties who might have had standing under the Constitution but, instead, limited standing to a plaintiff who commenced an action "on his own behalf." *See* 33 U.S.C. § 1365(a). Defendant then concludes that because the Sierra Club has acknowledged that its standing here is not based on any injury to itself, dismissal is required.

Plaintiff suggests, however, that defendant's hypertechnical reading of the statute is not justified, particularly in light of the Supreme Court decision in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), and a number of lower court cases construing the standing requirement under the FWPCA more broadly. This Court agrees.

At the outset, it is important to note that a number of courts already have implicitly approved representational suits under section 505. *See RITE—Research Improves the Environment, Inc. v. Costle,* 650 F.2d 1312 (5th Cir.1981); *Montgomery Environmental Coalition v. Costle,* 646 F.2d 568 (D.C.Cir.1980); *Pymatuning Water Shed Citizens for a Hygienic Environment v. Eaton,* 506 F.Supp. 902 (W.D.Pa.1980), *aff'd,* 644 F.2d 995 (3d Cir.1981); *Loveladies Property Owners Association, Inc. v. Raab,* 430 F.Supp. 276 (D.N.J.1975), *aff'd mem.,* 547 F.2d 1162 (3d Cir.1976); *Montgomery Environmental Coalition v. Fri,* 366 F.Supp. 261 (D.D.C.1973). Defendant attempts to distinguish these cases by arguing that the organizations involved were composed solely of local memberships and were formed specifically for the purpose of commencing the suits challenging allegedly adverse environmental action. Whatever other value this distinction may serve, it nonetheless remains the case that the organizations were permitted to maintain their suits under section 505 notwithstanding the fact that the suits were not brought by an individual plaintiff or organization "on [its] own behalf."

The decision of the former Fifth Circuit in *RITE—Research Improves the Environment, Inc. v. Costle,* 650 F.2d 1312 (5th Cir.1981) is instructive. In the context of

an associational suit brought pursuant to section 505, the court wrote:

There is absolutely no question that, under *Sierra Club v. Morton*, 405 U.S. 727 [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972), a not-for-profit organization satisfies the injury in fact requirement of Article III of the Constitution when it "allege[s] that it or its members w[ill] be affected in any of their activities or pastimes" by the allegedly illegal actions of which it complains. 405 U.S. at 735 [92 S.Ct. at 1366]. The Supreme Court in *Sierra Club* premised its standing analysis upon the principle that "[w]here the party does not rely on any specific statute authorizing invocation of the judicial process, the question of standing depends upon whether the party has alleged a 'personal stake in the outcome of the controversy.'" 405 U.S. at 732 [92 S.Ct. at 1364]. The Court thus concluded that the Sierra Club had failed to establish a personal stake in the outcome because that organization's pleadings contained no allegations that its members would be directly affected by the proposed Mineral King development.

In the instant case, RITE has alleged precisely what Sierra Club did not. Appellant has virtually tracked the Supreme Court's language by specifically alleging in its verified complaint that RITE members will be adversely affected by the pollution of the water and the contamination of the marine life. RITE members have therefore alleged a concrete "injury in fact"—the injury which flows from the fact that RITE members will no longer be able to swim or fish in the waters surrounding Miami Beach because of the chemical contamination caused by secondary treatment. Comparing the Court's language in *Sierra Club* and the allegations in RITE's complaint, we must conclude that appellant has alleged an "injury in fact" within the meaning of Article III of the Constitution, and therefore RITE has standing to obtain judicial review on the merits.

650 F.2d at 1319 (footnote omitted). Here, too, plaintiff has alleged the concrete "inju-

ry in fact" required by *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Paragraph seven of plaintiff's complaint alleges the following:

7. Members of the Sierra Club reside in New York, in the vicinity of the Grass River and the Old Power Canal, or own property or recreate in, on or near the Grass River and Old Power Canal. The quality of the nation's waters and the waters of the State of New York directly affects the health, economic, recreational, aesthetic, and environmental interests of the Sierra Club's members. The interests of Sierra Club's members have been, are being and will be adversely affected by the Defendant The Aluminum Company of America's failure to comply with its NPDES/SPDES permit requirements.

Even more importantly, however, the *RITE* court concluded its analysis by noting:

But the appellant here asserts an even stronger claim for standing than that alleged by the *Sierra Club* litigants. As mentioned above, the Court's reasoning was premised upon the fact that Sierra Club could point to no specific statutory provision authorizing federal suit. In the instant case appellant brings suit pursuant to Section 505 of the Federal Water Pollution Control Act, 33 U.S.C. § 1365, a provision which specifically authorizes lawsuits such as this one in the federal courts.

. . . .

Appellant thus asserts two grounds for standing—one pursuant to *Sierra Club*, the other pursuant to Section 505, and appellant's reliance upon their combination is well placed. Those courts which have considered citizens' suits under the FWPCA have suggested that the two are interwoven, with the effect that proof of "injury" under *Sierra Club* greatly strengthens a citizen's right to sue under Section 505. For example, in *National Sea Clammers Association v. New York*, 616 F.2d 1222 (3d Cir.), *cert. granted*, [449] U.S. [917], 101 S.Ct. 314,

66 L.Ed.2d 145 (1980), an association of fishermen sued federal, state, and local officials and the EPA to enjoin the discharge of toxic sewerage which contaminated the shellfish and marinelife in the waters where plaintiffs fished. The association alleged a violation of the FWPCA, including the 1977 Clean Water Act Amendment. The district court granted summary judgment for the defendants, holding that the notice provision of Section 505(b) was a jurisdictional prerequisite to suit and that the association's failure to give notice barred suit under Section 505(a).

The court of appeals reversed. In so doing, the court emphasized that Congress had intended to authorize standing for *the broadest possible scope of litigants in order to foster enforcement by* "*private attorneys general*":

> The Senate version of the bill would have permitted any person to enforce the terms of the Act. The House bill would have limited citizens' suit narrowly to suits brought by two types of plaintiffs, citizens of the geographic area who were directly affected by the alleged violation, or groups of persons who ... had shown an interest in the area or the controversy. The Conference Committee chose a middle path, limiting the section 505(a) remedy to citizens, but defining citizen broadly in section 505(g). [Section 505(g) states: For purposes of this section the term "citizen" means a person or persons having an interest which is or may be adversely affected.] The intent of Congress was thus to provide generally for citizens' suits which would not be subject to the jurisdictional amount requirement and yet would provide for private attorney general enforcement to the maximum degree permitted by the Court's *Sierra Club* decision.

*Id.* at 1226–27 (footnotes omitted).

*National Sea* went on to hold that the plaintiffs were not barred by the notice provision of Section 505(b) because that provision only applied when "a non-injured member of the public sues to enforce the Act." *Id.* at 1227. The court's holding is significant in that it implies its inverse with equal force, namely that *a non-injured member of the public has standing to sue under Section 505 provided he complies with the notice requirements*. As the court put it, not only did the statute grant a cause of action for "the protection of individuals from injury caused by the polluting activities of others ..., *the Act specifically grants a remedy to non-injured persons suing on behalf of the public*." *Id.* at 1229. Under both holdings, RITE has standing to maintain this action.

650 F.2d at 1319, 1321 (footnotes omitted) (emphasis added). The *RITE* court was aware that the Supreme Court had granted *certiorari* in *National Sea Clammers* but noted that the Court limited the grant of the petition to issues in the cases other than the question of standing under section 505 of the FWPCA. 650 F.2d at 1321 n. 13. In fact, the Supreme Court did ultimately reverse and remand the *Sea Clammers* cases but did so without addressing the standing problem. *Middlesex County Sewerage Authority v. National Sea Clammers Association*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981).[2] *See also Loveladies Property Owners Association, Inc. v. Raab*, 430 F.Supp. 276, 279–80 (D.N.J.1975) (plaintiff associations have standing under citizens suit provision of section 505), *aff'd mem.*, 547 F.2d 1162 (3d Cir.1976); *Montgomery Environmental Coalition v. Fri*, 366 F.Supp. 261, 264 (D.D.C.1973) (community groups have standing to assert claims pursuant to section 505).

There is simply no support for defendant's position that the inclusion in section 505 of the words "on his own behalf" precludes citizen suits by representative organizations. While defendant correctly notes that there is a presumption against

**2.** In finding no implied right of action under the FWPCA, the Court did, however, criticize the Third Circuit's suggestion that section 505 permits suits by "non-injured" plaintiffs. 453 U.S. at 15–17, 101 S.Ct. at 2623–2624.

construing a statute as containing superfluous or meaningless words, *see United States v. Blasius*, 397 F.2d 203, 207 n. 9 (2d Cir.1968), *cert. dismissed*, 393 U.S. 1008, 89 S.Ct. 615, 21 L.Ed.2d 557 (1969), this Court concludes that the phrase "on his own behalf" is not mere surplusage but rather was intended only to exclude class action suits. As the court noted in *Brown v. Ruckelshaus*, 364 F.Supp. 258 (C.D.Cal. 1973):

> What quickly becomes apparent is the passage stating that one may sue only "on his own behalf." The legislative history bluntly states that this section was inserted to prevent the exact situation Congressman Brown is trying to create. "The section is drawn to avoid problems raised by class action provisions of the Federal rules of civil procedure, specifically by Rule 23. Section 505 does not authorize a 'class action.' Instead, it would authorize a private action by any citizen or citizens acting on their own behalf. Questions with respect to traditional 'class' actions often involve: (1) identifying a group of people whose interests have been damaged; (2) identifying the amount of total damage to determine jurisdiction qualification; and (3) allocating any damages recovered. None of these points is appropriate in citizen suits seeking abatement of violations of water pollution control requirements. It should be noted, however, that the section would specifically preserve any rights or remedies under any other law. Thus, if damages could be shown, other remedies would remain available." 1972 U.S.Code Cong. and Admin.News, at p. 3746.

364 F.Supp. at 265 (footnote omitted); *see also City of Philadelphia v. Stepan Chemical Co.*, 544 F.Supp. 1135, 1146 (E.D.Pa. 1982); *cf. Ohio ex rel. Brown v. Callaway*, 497 F.2d 1235, 1242 (6th Cir.1974) (right to intervene as plaintiffs, Fed.R.Civ.P. 24(a)(1), granted to organizations pursuant to section 505 since complaints alleged that members would suffer injury); *United States v. Hooker Chemicals & Plastics Corp.*, 540 F.Supp. 1067, 1080–82 (W.D.N.Y.1982) (same). These decisions and their analyses of the legislative history of section 505 buttress this Court's conclusion that organizations are entitled to maintain suits under section 505 on behalf of their members. Clearly, such a result has been implicitly approved by the host of courts that have already sanctioned associational suits notwithstanding the apparently limiting language of section 505.

Finally, worthy of note is a recent unpublished decision of the district court for the District of New Jersey, *Student Public Interest Research Group of New Jersey v. Monsanto Co.*, No. 83–2040 (D.N.J. Nov. 18, 1983). In rejecting defendant's motion to dismiss a claim brought pursuant to section 505 on standing grounds, the court expressly held:

> An environmental organization whose members are sufficiently affected may sue on their behalf.... The fact that the plaintiff environmental groups may have other members who do not reside along the affected portion of the river or that there is an overwhelming preponderance of their membership who do not have the same requisite standing as do the members upon which those organizations rely, is of no legal consequence to this court or the disposition of those motions before the court today. Certainly, those factors do not disqualify the groups from litigating on behalf of their affected members.

Slip op. at 7–8. While defendant correctly notes that the thrust of the *Monsanto* decision concerned a proper construction of "citizen" as that term is used in section 505, 33 U.S.C. § 1365(g), the court nonetheless approved, at least impliedly, representational suits, that is, those brought by a plaintiff other than "on his own behalf."

On balance, this Court concludes that section 505 does not preclude suits brought by organizations on behalf of their members. Suits such as the present one are clearly within the contemplation of the statute since the Sierra Club obviously sues "on [its] own behalf" when it seeks to

vindicate the statutory protections afforded its members. To the extent an organization which is devoted to protecting and advancing the rights of its members invokes section 505 to effectuate such an end, the suit is clearly brought on its own behalf, albeit, as well as on behalf of its members.[3]

## 2. *Article III standing*

Alcoa next argues that even if section 505 did not bar the Sierra Club from maintaining the present action in its representational capacity, it would nonetheless lack standing under the more traditional article III analysis.

While conceding that an "organization whose members are injured may represent those members in a proceeding for judicial review," *Sierra Club v. Morton*, 405 U.S. 727, 739, 92 S.Ct. 1361, 1368, 31 L.Ed.2d 636 (1972), defendant argues that plaintiff must be acting as a representative of members who would themselves have standing

---

**3.** This conclusion is further supported by the expansive definition of citizen contained in 33 U.S.C. § 1365(g): "For the purposes of this section the term 'citizen' means a person or persons having an interest which is or may be adversely affected." The Supreme Court noted in *Middlesex County Sewerage Authority v. National Sea Clammers Ass'n*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981) that: "It is clear from the Senate Conference Report that this phrase was intended by Congress to allow suits by all persons possessing standing under this Court's decision in *Sierra Club v. Morton*, 405 U.S. 727 [92 S.Ct. 1361, 31 L.Ed.2d 636] (1972)." Since Congress clearly contemplated that organizations be entitled to maintain actions under section 505, as long as the traditional standing requirements of *Sierra Club v. Morton* had been met, there simply is no reason to accept defendant's restrictive interpretation.

Moreover, section 505(b)(1)(B) provides that "if the Administrator or State has commenced and is diligently prosecuting a civil or criminal action in a court of the United States ... *any citizen* may intervene as a matter of right." 33 U.S.C. § 1365(b)(1)(B). Concededly, the question of intervention is to be distinguished from that involving commencement of litigation. Nonetheless, to the extent intervention is not limited to parties intervening "on their own behalf," there is good reason to infer that Congress was concerned only with the more traditional question of parties' standing and was not intending to preclude involvement by associational plaintiffs.

to sue. *See Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977); *Health Research Group v. Kennedy*, 82 F.R.D. 21, 27 (D.D.C.1979). Alcoa contends that here, the Sierra Club is merely a "volunteer" or a "concerned bystander," *see Valley Forge Christian College v. Americans United for Separation of Church and State*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982); *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973), and that the lawsuit is one that it "invented" without ever consulting any of the few club members who live near the polluting facility who might or might not have had standing.[4]

Defendant places a good deal of reliance upon the decision in *Pacific Legal Foundation v. Gorsuch*, 690 F.2d 725 (9th Cir. 1982).[5] There, the Ninth Circuit considered

---

**4.** Defendant argues that no member of the Sierra Club has standing to bring this suit because prior to filing an action under section 505, a plaintiff must have "given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard ...." 33 U.S.C. § 1365(b)(1)(A). While there is no dispute that no Sierra Club member has ever given such notice, defendant's argument is nonetheless without merit. It is certainly clear that individual members could have served notice and thereby could have commenced litigation. Accordingly, individual members would have standing.

**5.** The citation to *Pacific Legal Foundation* raises an interesting problem. Counsel for Alcoa advised the Court in a footnote to its memorandum that "[t]hat decision ... appeared in West Reporting Service's Advance Sheets, but has been omitted from the bound volume. Upon telephoning the Office of the Clerk of the Ninth Circuit, Alcoa's counsel was instructed that the *Pacific Legal Foundation* decision stands as the law of the Ninth Circuit and may be cited for precedent." Defendant's Memorandum in Support of Motion to Dismiss at 8–9 n. **. An Editor's Note appearing at page 725 of volume 690 of West's Federal Reporter 2d Series states: "The opinion of the United States Court of Appeal [sic], Ninth Circuit in *Pacific Legal Foundation v. Gorsuch* published in the advance sheet at this citation, 690 F.2d 725–731, was with-

the standing of a public interest law organization which had sued to compel compliance with certain provisions of the Clean Air Act, 42 U.S.C. § 7401 *et seq.* The organization had alleged that its members had been threatened with "severe economic dislocation" as a result of the alleged noncompliance with the Act and that "interests of ... members ... are injured in fact by the failure of defendant ... to promulgate a plan for implementation of primary national ambient air quality standards ..., [i]nterests ... within the zone of interests of the Clean Air Act." 690 F.2d at 728 (advance sheet). The court found, however, that the organization was without standing to sue since the litigation was initiated by the foundation on its own and not as a true representative of its members.[6] It is clear, however, that the *Pacific Legal Foundation* decision is factually distinguishable from the case at bar. Significantly, the organization which was held not to have standing was, unlike the Sierra Club, composed not so much of "members" as it was of "supporters" and "contributors." The decision-making body of the organization more closely resembled the "concerned bystander" than persons who suffered injury in fact. Indeed, the court was concerned solely with the anonymity of the organization's membership and the absence of any allegations of identifiable injury in 690 F.2d at 730–31 (advance sheet). In the present case, there can be no question that plaintiff has alleged the necessary

injury in fact suffered by its members required to confer upon its standing under article III principles. Defendant's attempt to capitalize on the extraordinarily broad language employed by the *Pacific Legal Foundation* court in the unique factual context before it is simply not justified.

Defendant also cites *Health Research Group v. Kennedy,* 82 F.R.D. 21 (D.D.C. 1979) and argues that the central question involving the standing of an organization concerns whether or not the members claimed to be represented by the organization actually have control over their putative representative. Like *Pacific Legal Foundation,* this case too is readily distinguishable. Judge Sirica began his decision by noting:

> Plaintiffs do not, however, seek standing as the representatives of their *members.* Indeed, plaintiffs concede that they have no members, having been intentionally structured as non-membership organizations in order to promote "efficiency." Rather, plaintiffs allege injury only to their "contributors" and "supporters." Because plaintiffs do not claim injury to any interest of their own, the question arises whether they may have standing *solely* as the representatives of these contributors and supporters.

82 F.R.D. at 24 (emphasis in original) (footnote omitted). Relying on the Supreme Court decision in *Hunt v. Washington*

---

drawn from bound volume at the request of the court." In the interest of accuracy, this Court contacted the chambers of Judge Duniway, author of the *Pacific Legal Foundation* panel decision. Judge Duniway advised that the decision is *not* to be cited as *binding precedent* of the Ninth Circuit in light of that court's determination to withdraw the decision. Accordingly, this Court feels justified in attributing little precedential weight to the result reached in that case.

**6.** In particular, the court held:

The Foundation has no standing to assert any of the claims that it makes. It does not allege that any of its directors, members, supporters, or contributors has authorized or asked it to represent them in either case. It does not allege that it does represent any of them. Moreover, it does not breathe the air in California, nor is its corporate health affected by what the Adminis-

trator has or has not done in California. None of the members, directors, supporters, or contributors is here asserting the claims that the Foundation asserts.

....

All of the Foundation's trustees, members, supporters, and contributors are, so far as this case is concerned, anonymous. None of them is alleged to have authorized the Foundation to represent his or her personal, direct interests in this case. If any of them "can show 'injury in fact' resulting from the action which they seek to have the court adjudicate," he or she is not identified, nor is he or she shown to have authorized the Foundation to represent him or her in making such a showing. They simply are not here.
690 F.2d at 729, 730–31 (advance sheet) (citations omitted).

*State Apple Advertising Commission,* 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977), Judge Sirica discussed the necessity of membership or its functional equivalent in order to establish associational standing:

Members, as the Court implicitly acknowledged in *Hunt,* normally exercise a substantial measure of power or control over an organization which, in typical circumstances, they themselves have created. In *Hunt,* "the indicia of membership" were present because the growers and dealers *alone* elected the members of the Commission, served as members of the Commission, and financed its activities. In a real sense then, despite the anomaly that the Commission was a *state*-created, non-membership organization, it was totally a creature of the parties it purported to represent.

. . . .

In the Court's view, there is a material difference of both degree and substance between the control exercised by masses of *contributors* tending to give more or less money to an organization depending on its responsiveness to their interests, or through the expression of opinion in the letters of *supporters,* on the one hand, and the control exercised by *members* of an organization as they regularly elect their governing body, on the other.

82 F.R.D. at 26, 27.

There can be no question here that members of the Sierra Club do in fact retain effective control over the organization. Generally of course, members pay dues and obtain voting rights by which they may control the activities of the Club through policy setting and election of a board of directors. Indeed, members join the organization with an expectation that they will have a voice in the policies and decisions of the organization. For example, the membership brochure recites: "You have a say in how the Club is run. You elect your local Chapter's Executive Committee, the National Board of Directors, or you may even decide to run for a Club office yourself." (Plaintiff's exhibit B). Indeed,

members are strongly encouraged to vote, as evidenced by an article in the Winter 1980–81 edition of the Atlantic Chapter's newsletter, *Sierra Atlantic:*

It is essential that all Sierrans participate in this year's election because the Executive Committee is the Club's official policy-setting entity in New York State. All ... legal actions must be approved by the Chapter ExCom ... and ... each member of the Executive Committee should be chosen to express your environmental views on local, State, and national issues.

(Stipulation, attachment 3).

Defendant nonetheless argues that the fifty-five of the Club's approximately 340,-000 members who are affected by the violations which underly this suit cannot possibly be said to control this litigation or the Sierra Club. Defendant's suggestion is belied by the analogous and familiar traditions of the American electorate. Defendant could not seriously suggest that individual citizens who exercise their right to vote for their elected representatives similarly have no control over government policy.

Moreover, defendant overlooks the presence of local Sierra Club chapters over which area members surely have more control. Simply because the members who are affected by defendant's activities represent but a small segment of the Sierra Club's membership does not entitle defendant to belittle or demean these members' ability to assert control over their organization. The Sierra Club is indeed "totally a creature of the parties it purport[s] to represent," *Health Research Group,* 82 F.R.D. at 26, at least to the extent it is an organization founded upon participation and involvement by its members. The fact that members, to the extent possible, retain effective control over the direction the Club chooses to pursue distinguishes it significantly from the organization described by Judge Sirica in *Health Research Group. Cf. Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975) ("The organization must allege that its

members, *or any one of them*, are suffering immediate or threatened injury...." (emphasis added)).

Finally, Alcoa argues. that the Sierra Club never consulted any of its members or solicited their input into the decision to commence the instant litigation. Alcoa does not go so far as to "say that the Sierra Club must hold an election prior to bringing any representational suit.... Nor [does it mean] to challenge the idea that some Sierra Club members support the litigation efforts of that organization. Alcoa's point is simply that the concept of a representational suit is not so attenuated as to permit a large organization and its private attorneys to comb the nation in search of causes, commence lawsuits as they elect, and then scramble to find some affiliated person to endorse the action after-the-fact. When an association is permitted to sue as a representative, some closer nexus, in the form of true—not merely formal—representation, between the putatively injured member and the commencement of the specific lawsuit is necessary." Defendant's Reply Memorandum in Support of Motion to Dismiss at 9 (footnote omitted). Alcoa simply argues that "[u]nless the local members possessing some interest-at-risk are solicited in advance for their opinions, pro or con, the Sierra Club cannot claim to be a representative of those members." *Id.* at 10–11 (footnote omitted). This Court concludes, however, that the Sierra Club has sufficiently established the requisite elements of associational standing as delineated in a long line of Supreme Court cases, and declines to accept Alcoa's invitation to add to these principles additional restrictions having the effect of constricting the abilities of organizations like the Sierra Club to advance their membership's objectives.

The Supreme Court decision in *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) articulated the three prerequisites to proper associational standing:

Thus, we have recognized that an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted, nor the relief requested, requires the participation of individual members in the lawsuit.

432 U.S. at 343, 97 S.Ct. at 2441. There is no question here that plaintiff meets all three *Hunt* requirements. First, it is beyond dispute that the Sierra Club members "would otherwise have standing to sue in their own right." 432 U.S. at 343, 97 S.Ct. at 2441. Paragraph seven of plaintiff's complaint contains the necessary allegations of injury to the organization's members. *See United States v. SCRAP*, 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). It is clear that some members reside within thirty-five miles of the Alcoa facility and claim their interest in maintaining the quality of the surrounding water bodies has been threatened. *See Sierra Club v. Morton*, 405 U.S. at 734, 92 S.Ct. at 1366 (injury to environmental interests sufficient predicate for "injury in fact"). Indeed, the Sierra Club has provided the affidavit of one of its members, Dr. Marshall, who lives within ten miles of the Alcoa facility and recreates in the rivers which receive the effluent discharges.

Second, it is equally clear that the interests the Sierra Club seeks to protect here are germane to its purpose. Indeed, the Club's bylaws expressly state the Club's purposes to be:

To explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

(Plaintiff's exhibit A at 12, ¶ 2.2).

Finally, the third *Hunt* requirement is satisfied because individual plaintiffs are

not necessary here. Since the relief sought herein is essentially injunctive, such relief would inure to the benefit of any unnamed plaintiffs. Moreover, any civil penalties which might be assessed would be paid into the United States treasury. 33 U.S.C. § 1319(d).

Accordingly, this Court concludes that plaintiff does have standing to maintain the within claims and defendant's motion to dismiss must be denied.

### B. *Expired permits*

■ Alcoa also argues that even if the Sierra Club is found to have standing, most of the complaint's allegations are nonetheless subject to summary judgment. Specifically, Alcoa contends that more than ninety-five percent of the permit violations alleged by the Sierra Club relate to a federally issued permit that had expired prior to commencement of this action. Alcoa cites *City of Evansville v. Kentucky Liquid Recycling, Inc.*, 604 F.2d 1008 (7th Cir. 1979), *cert. denied*, 444 U.S. 1025, 100 S.Ct. 689, 62 L.Ed.2d 659 (1980), which held that section 505

> authorizes a civil action against a party "alleged to be in violation" of effluent standards or limitations prescribed under the Act or an order of the Administrator or a state with responsibility under the Act. It does not provide for suits against parties alleged to have violated an effluent standard in the past or for recovery of damages.

*Id.* at 1014. Alcoa draws additional support for its position from the language of section 505(f), 33 U.S.C. § 1365(f), which provides that for purposes of section 505, the term "effluent standard or limitation under this chapter" means a pollutant discharge elimination system permit "which *is in effect* under this chapter." (emphasis added).

Plaintiff's response is twofold. First, the Sierra Club argues that summary judgment would be inappropriate at this time

because it has not yet had ample opportunity for discovery. In particular, plaintiff suggests that through discovery it may be able to determine, *inter alia*, whether and to what extent violations of the old permit would still be violations of the new permit. To the extent this prospect poses factual questions, summary judgment at this time would indeed be inappropriate. *See* Fed.R. Civ.P. 56(f); *Quinn v. Syracuse Model Neighborhood Corp.*, 613 F.2d 438, 445 (2d Cir.1980); *National Life Insurance Co. v. Solomon*, 529 F.2d 59, 61 (2d Cir.1975).

More significantly, however, the Sierra Club points to a more recent decision of the Seventh Circuit (the same court that decided the *Evansville* case) which specifically permitted a grant of relief for violations of an expired permit. *Illinois v. Outboard Marine, Inc.*, 680 F.2d 473 (7th Cir.1982).[7] The defendant in *Outboard Marine* argued that since it received a new permit subsequent to the filing of the lawsuit, it could not be found to be out of compliance. The court disagreed and expressly held that the plaintiff could "continue[ ] to seek prospective relief from the effects of past discharges," including fines and penalties. *Id.* at 481.

Alcoa attempts to distinguish *Outboard Marine* by arguing that the permits there were in effect when the suit was commenced and only expired later. Thus, defendant argues, the plaintiff there was in compliance with section 505 because it "commenced" an action against a defendant "alleged to be in violation" of an effluent standard. *See* 33 U.S.C. § 1365(a). Here, Alcoa argues, plaintiff commenced the action only after expiration of the permit. This Court concludes that any such distinction is without significance. What is important about the decision in *Outboard Marine* is that a form of relief remained available for past violations. Here, plaintiff, as a private attorney general, seeks the imposition of civil penalties against de-

---

**7.** Plaintiff also correctly notes that the facts underlying the *Evansville* decision render that case distinguishable from the instant one. In *Evansville,* plaintiffs sought principally to recover damages for defendant's past violations. The *Evansville* plaintiffs, unlike the Sierra Club, did not seek injunctive relief and civil penalties.

fendant. The availability of such relief is well in keeping with the holding of *Outboard Marine. See Student Public Interest Research Group of New Jersey v. Monsanto Co.,* No. 83–2040 slip op. at 14–15 (D.N.J. Nov. 18, 1983) ("The defendants next argue that summary judgment is unwarranted because most of the permit violations occurred before January 1, 1982, and that the citizen suit provisions of the act were primarily intended to effectuate prospective relief. It is contended that suits to exact penalty [sic] for past violations should be left to the government. The plain language of section 1365 indicates, however, that civil penalties may be addressed in citizen suits under the act"). To allow defendant to escape application of these sanctions by obtaining a new permit clearly would frustrate the purposes of the Act. Nonetheless, to the extent plaintiff seeks to enjoin defendant's further violations of the outdated permit, such a request for relief is moot. However, since some relief is still available, defendant's motion for summary judgment must be denied.

Plaintiff offers additional support for this Court's conclusion that expiration of the permit does not preclude relief. First, the Act's legislative history suggests congressional intent to provide for relief for past violations. The Senate, in considering the citizen suit provision in the 1972 Clean Water Act Amendments stressed that "a citizen has a right under section 505 to bring an action for an appropriate remedy in the case of any person who is alleged to be, *or to have been,* in violation, whether the violation be a continuous one, or an occasional or sporadic one." H.R.Rep. No. 92–911, 92d Cong., 2d Sess., *reprinted in* 1 Legislative History of the Water Pollution Control Act Amendments of 1972, at 179 (1973). Moreover, plaintiff argues persuasively that public policy supports the notion that Alcoa should be responsible for violations of its old permit. First, to accept Alcoa's position, a company would never be liable for violations occurring immediately preceding expiration of a permit, since by the time a plaintiff gave notice and filed a suit the company would have a new permit. Second, the purpose behind the statute's provisions for civil penalties would be frustrated by Alcoa's position. To the extent the Act seeks to deter violations, permitting a defendant to avoid liability for past violations works a substantial diminution of any deterrent effect.

## IV

On balance, this Court is persuaded that the Sierra Club may properly be said to possess standing to maintain the present suit both under the statutory framework of section 505 as well as under more general notions of article III standing. There is simply no merit to defendant's contention that the Sierra Club is not an appropriate representative of its members and therefore not entitled to prosecute the instant action. Accordingly, defendant's motion to dismiss is denied. Similarly, the Court concludes that partial summary judgment with respect to claims stemming from an expired permit is not warranted in light of the availability of civil penalties should plaintiff prevail at trial. Plaintiff's request for injunctive relief with respect to the expired permit, however, is moot. Defendant's motion for summary judgment therefore is denied.

It is so Ordered.